**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 22-2846
_____

TONY FISHER, a/k/a Kellie Rehanna,
                                        Appellant

v.

WARDEN JORDAN HOLLINGSWORTH; WARDEN
DOE; UNIT DOE, Unit Manager, MS. FISCHER; MR.
WILLIAMS; N. WATKINS WARD; ANNA MORFE;
STACIE D. MARANTZ-TATTERSDI; FEDERAL
BUREAU OF PRISONS
_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 1-18-cv-16793)
District Judge: Honorable Karen M. Williams
_____

Argued on February 8, 2024

Before: HARDIMAN, SCIRICA, and RENDELL, *Circuit
Judges*.

(Filed: August 15, 2024)

Gregory Cui
Devi M. Rao
Roderick & Solange MacArthur Justice Center
501 H Street NE
Suite 275
Washington, DC 20002

Elena S. Meth [Argued]
Roderick & Solange MacArthur Justice Center
Supreme Court and Appellate Program
160 E Grand Avenue
6th Floor
Chicago, IL 60611

   *Counsel for Appellant*

Christina S. Paek
Lambda Legal
800 S Figueroa Street
Suite 1260
Los Angeles, CA 90017

Richard Saenz
Lambda Legal
120 Wall Street
19th Floor
New York, NY 10005

  *Counsel for Amici Curiae Lamda Legal Defense &*
*Education Fund, Inc., Black and Pink National, Center for*
*Constitutional Rights, and Just Detention International in*
*Support of Appellant*

Jessica R. Amunson
Elizabeth B. Deutsch
Jenner & Block
1099 New York Avenue NW
Suite 900
Washington, DC 20001

*Counsel for Amicus Curiae New Jersey Coalition Against Sexual Assault in Support of Appellant*


Philip R. Sellinger
Angela Juneau [Argued]
Office of United States Attorney
970 Broad Street
Room 700
Newark, NJ 07102

J. Andrew Ruymann
Office of United States Attorney
402 E State Street
Suite 430
Trenton, NJ 08608

*Counsel for Appellee*

_____

OPINION OF THE COURT
_____


HARDIMAN, *Circuit Judge*.

This appeal involves an inmate seeking to recover damages from federal prison officials because of sexual assaults committed by another inmate. Consistent with the Supreme Court's opinion in *Egbert v. Boule*, 596 U.S. 482 (2022), we hold that no federal constitutional claim lies to redress such injury. And even if it did, the complaint filed in this case was untimely. For these reasons, we will affirm the District Court's order dismissing the suit.

I

A

Plaintiff-Appellant Tony Fisher[1] entered federal prison in summer 2013 after pleading guilty to charges of producing child pornography and enticing a minor for child

_____

[1] As the District Court noted, "Plaintiff is a biological male who now identifies as transgender." *Fisher v. Worth*, 2022 WL 3500432, at *1 (D.N.J. Aug. 18, 2022). "At the time of the events that give rise to this matter, Plaintiff did not identify as transgender." *Id.* Plaintiff signed the pro se complaint and the notice of appeal as "Tony Fisher." But Plaintiff now also goes by "Kellie Rehanna." Consistent with the prison records, complaint, notice of appeal, and caption, we refer to Plaintiff as Fisher.

pornography.[2] After an initial interview, the Bureau of Prisons (BOP) did not identify Fisher as at risk for sexual assault.

In July 2013, Fisher was transported to Fort Dix, a federal prison in New Jersey. There Fisher reported having been sexually assaulted at age 13, but that was Fisher's only listed risk factor for sexual assault. A week after arriving, Fisher complained to the unit counselor about being verbally harassed and catcalled by other prisoners—especially by a prisoner known only as "C." Fisher then met with the prison's staff psychologist, Dr. Anna Morfe. Morfe found that Fisher had five risk factors for sexual assault: status as victim of sexual assault, fear of the general prison population, sexual orientation, status as a first-time prisoner, and criminal history of sex offenses. Yet Morfe wrote: "Based upon a discussion with the Inmate, he shows no indications that would require his 'at risk' level to be raised significantly above any other inmate's."[3]

Within days of this meeting, the inmate known as "C" raped Fisher. Three times over the course of three days, "C" performed unwanted sex acts on Fisher and forced Fisher to perform sex acts on him.

Prison staff learned about the rapes a week and a half later, when they overheard Fisher discussing them on a phone

---

[2] *See* 18 U.S.C. § 2251(a); *id.* § 2422(b). At this stage of the proceedings, we accept as true the facts pleaded in the complaint. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). We also consider exhibits attached to the complaint and matters of public record. *See Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010).

[3] App. 54.

call. The prison promptly intervened. Dr. Morfe re-evaluated Fisher, this time concluding that Fisher was at risk of assault. So Fisher was moved to a segregated housing unit.

While in the Fort Dix prison's segregated housing unit that summer, Fisher was taken to speak with Captain Janet Fitzgerald. According to Fisher's declaration, Fitzgerald warned Fisher "never [to] talk about the rapes" because "C" could find Fisher through the BOP database even after Fisher's transfer to another prison, and prison staff would not protect a snitch.[4] Fitzgerald likewise instructed that Fisher "must wait until the BOP conducted an internal investigation" and the agency's attorneys reached out, rather than contacting an attorney about the rapes.[5] As Fisher's declaration explains:

> 77. Capt. Fitzgerald said I should not "cause problems" for the BOP or they would make problems for me, including by keeping me from getting help from attorneys on the outside, and through "diesel therapy"—which she explained meant shipping an inmate from prison to prison until the inmate stopped complaining.

> 78. Captain Fitzgerald's words literally frightened me for my life to take any legal action, because I genuinely feared "C" would hunt me down wherever I was.

> 79. I believed Captain Fitzgerald completely that I needed to just let the BOP handle all legal aspects and that I should wait until the BOP and

---

[4] App. 77.
[5] *Id.*

6

FBI finished their investigation. I did not know enough about how the legal system or the prison hierarchy work to doubt her.[6]

After the assaults of summer 2013, Fisher underwent a psychological evaluation at Fort Dix. According to the psychological report, Fisher "denied the presence of any current mental health complaints and declined the use of psychology services at this time."[7]

In September 2013, the BOP transferred Fisher from Fort Dix to a federal prison in Arkansas. Fisher underwent a psychological evaluation there in early 2014. According to the psychologist, "Fisher stated he is currently feeling 'good' and that he is prescribed [three different drugs] to alleviate mental health symptoms."[8] Fisher's "[m]ental status was [Within Normal Limits]."[9] But in December 2014, the mental health report was mixed. Fisher "struggl[ed] with an increase in anxiety," experienced "loss of appetite," and "presented as fatigued."[10] At the same time, Fisher "appeared alert and oriented," demonstrated "no behavioral abnormalities," and had "organized, coherent, and goal-directed" thought processes.[11]

While seeking psychological records in 2017, Fisher learned that the BOP had substantiated the rape allegations. Fisher immediately filed a request for administrative remedies

---

[6] *Id.*
[7] Supp. App. 57.
[8] Supp. App. 58.
[9] *Id.*
[10] Supp. App. 59.
[11] *Id.*

in connection with the rapes, seeking $20 million in compensatory damages and $20 million in punitive damages from the BOP. Later that month, the Fort Dix Warden denied the request. And on appeal, the BOP clarified that "the Administrative Remedy Program does not ordinarily provide for monetary relief."[12]

By fall 2018, Fisher's mental health had worsened. Fisher wrote in an email to a prison psychologist:

> [A]ll of my PTSD symptoms have been quite severe for quite a while as you know, I know that it's not my fault, but they're getting worse. I try to cope, calm myself, etc…, but nothing helps. The flashbacks, debilitating stress, etc. I relive the rapes daily. I'm no better now than years ago.[13]

B

In late 2018—more than five years after the 2013 assaults—Fisher filed this suit under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*.[14] The operative complaint named eight federal prison officials as defendants in their individual capacities. Fisher claimed Defendants violated the Eighth Amendment's prohibition on "cruel and unusual punishments" through their deliberate indifference to the risk of inmate-on-inmate sexual assault. Fisher sought $10 million

---

[12] Supp. App. 288.
[13] Supp. App. 63.
[14] 403 U.S. 388 (1971).

in compensatory damages and $10 million in punitive damages for each rape.

Defendants moved to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure. They argued: (1) Fisher's suit was time-barred; and (2) Fisher had no *Bivens* cause of action at all.

The District Court granted Defendants' motion and dismissed Fisher's operative complaint. Applying New Jersey's two-year statute of limitations for personal injury actions, the Court concluded that Fisher's *Bivens* suit was time-barred.[15] Fisher filed this timely appeal.[16]

II

Although the District Court did not address whether Fisher's complaint was cognizable under *Bivens*, that issue logically precedes the timeliness question. So we first ask whether Fisher pleaded a cognizable *Bivens* claim. The answer is no.

A

In 1871, Congress enacted 42 U.S.C. § 1983, which created a private cause of action to redress violations of federal rights committed by state actors. But Congress has yet to create a similar cause of action to vindicate violations of federal rights

---

[15] *See Fisher*, 2022 WL 3500432, at *4–5.

[16] The District Court had jurisdiction under 28 U.S.C. § 1331. We have jurisdiction under 28 U.S.C. § 1291. We review de novo the District Court's order of dismissal. *Ocean Cnty. Bd. of Comm'rs v. Att'y Gen.*, 8 F.4th 176, 180 (3d Cir. 2021).

by *federal* officers. In its 1971 *Bivens* decision,[17] the Supreme Court implied a cause of action against federal drug agents whose warrantless search of a home violated the Fourth Amendment. The Court extended *Bivens* eight years later in *Davis v. Passman*,[18] which created a Fifth Amendment damages action against a Congressman who fired a staffer because she was a woman.[19] A year later, *Bivens* was extended again in *Carlson v. Green*,[20] which implied an Eighth Amendment damages action against federal prison officials who failed to provide medical care to an asthmatic prisoner.[21] "Since these cases, the Court has not implied additional causes of action under the Constitution."[22]

With the new millennium, the Supreme Court took a new approach to implied causes of action. The Court noted that "private rights of action to enforce federal law must be created by Congress."[23] And failing that, "a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter."[24] Consistent with that approach, the Court's 2017 decision in *Ziglar v. Abbasi*[25] established a restrictive test for extending *Bivens*. The *Ziglar*

---

[17] *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

[18] 442 U.S. 228 (1979).

[19] *See id.* at 229–34.

[20] 446 U.S. 14 (1980).

[21] *See id.* at 16–18, 16 n.1.

[22] *Egbert*, 596 U.S. at 491.

[23] *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001).

[24] *Id.* at 286–87.

[25] 582 U.S. 120 (2017).

test first asked if the case presented a new *Bivens* context.[26] "If the case is different in a meaningful way from previous *Bivens* cases decided by this Court, then the context is new."[27] If the context was new, a court then asked whether any "special factors" showed that Congress, rather than the courts, should decide whether to extend *Bivens*.[28] This test counseled against extending *Bivens*, since "expanding the *Bivens* remedy [wa]s now a disfavored judicial activity."[29]

Yet even under the *Ziglar* test, the Third Circuit extended *Bivens*. In *Bistrian v. Levi*,[30] we held that a federal prisoner stated a "cognizable *Bivens* cause of action for the alleged failure of the defendants to protect him from a substantial risk of serious injury at the hands of other inmates."[31] At *Ziglar*'s first step, we concluded that an inmate's claim against federal prison officials for failure to protect "d[id] not present a new *Bivens* context."[32] In doing so, we relied on the Supreme Court's 1994 opinion in *Farmer v. Brennan*,[33] which had *assumed* a *Bivens* cause of action was available for failure to prevent inmate-on-inmate assault.[34] We

---

[26] *See id.* at 139–40.

[27] *Id.* at 139.

[28] *See id.* at 140.

[29] *Id.* at 135 (cleaned up).

[30] 912 F.3d 79 (3d Cir. 2018).

[31] *Id.* at 88.

[32] *Id.* at 90.

[33] 511 U.S. 825 (1994).

[34] *Farmer* involved an Eighth Amendment claim against federal prison officials who were indifferent to the risk that a prisoner would be sexually assaulted. *See id.* at 828–32. The Court granted certiorari to resolve a circuit split about the

stated that the *Farmer* Court "ha[d], pursuant to *Bivens*, recognized a failure-to-protect claim under the Eighth Amendment."[35] Although we determined that the plaintiff's failure-to-protect claim presented no new context vis-à-vis *Farmer*, we held in the alternative that the defendants' proposed special factors were not persuasive enough to foreclose a *Bivens* remedy.[36]

This Court stood by *Bistrian* in *Shorter v. United States*,[37] another case about inmate-on-inmate assault. The federal prisoner in *Shorter* alleged an Eighth Amendment *Bivens* claim: prison officials who had allowed the plaintiff to be raped by a fellow inmate were liable for deliberate indifference.[38] Applying *Bistrian*, we held that "*Farmer* remains good law. Our case therefore does not present a new *Bivens* context."[39] Fisher argues that our decisions in *Bistrian* and *Shorter* mean a *Bivens* claim is available here.

Defendants respond that *Bistrian* and *Shorter* have been abrogated by the Supreme Court's later decision in *Egbert v. Boule*.[40] We agree. *Egbert* tightened the *Ziglar* test and, in doing so, made a strong statement that lower courts should not

---

applicable Eighth Amendment standard*. See id.* at 832. *Farmer* adopted "subjective recklessness" as the standard, *see id.* at 839–40—and assumed, without deciding, that the plaintiff had a cause of action, *see id.* at 832–34.

[35] *Bistrian*, 912 F.3d at 91.

[36] *See id.* at 91–92.

[37] 12 F.4th 366 (3d Cir. 2021).

[38] *See Shorter*, 12 F.4th at 369.

[39] *Id.* at 373.

[40] 596 U.S. 482 (2022).

extend *Bivens* beyond the contexts recognized in *Bivens*, *Davis,* and *Carlson*.

At the first step, *Ziglar* had asked, somewhat vaguely, whether that case was meaningfully different "from previous *Bivens* cases decided by [the Supreme] Court."[41] When it formulated the first step, *Ziglar* did not specify which cases counted,[42] although it elsewhere discussed *Bivens*, *Davis*, and *Carlson* as the relevant cases.[43] *Egbert*'s new articulation of this step is clearer—and unequivocally narrows the universe of relevant cases to just three. *Egbert* requires us to ask whether Fisher's case meaningfully differs "from the *three cases* in which the Court has implied a damages action."[44] And *Egbert* clarifies that all cases since those three—including cases that "assumed . . . a [*Bivens*] action might be available"—are inapplicable.[45] Under this rubric, the only relevant cases are *Bivens*, *Davis*, and *Carlson*. So *Farmer* is out. Because they relied on *Farmer* at the first step, our decisions in *Bistrian* and *Shorter* deviate from *Egbert*.

*Egbert* also modified *Ziglar*'s second step, the special-factors analysis. *Ziglar* had asked "whether the Judiciary *is well suited*, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed."[46] *Egbert* now requires us to ask whether "the Judiciary *is at least arguably less equipped* than Congress" to weigh the costs and benefits of a damages

---

[41] *Ziglar*, 582 U.S. at 139.

[42] *See id.*

[43] *See id.* at 131.

[44] *Egbert*, 596 U.S. at 492 (emphasis added).

[45] *Id.* at 498; *see id.* at 491.

[46] *Ziglar*, 582 U.S. at 136 (emphasis added).

action.[47] If there is "*any* reason" to think this "*might*" be so, we cannot imply a *Bivens* remedy.[48] By contrast, *Bistrian* asked whether the special factors that the defendants cited were "[]persuasive," whether there were "*true* alternative remedies," and whether there was "*good reason* to fear that allowing [plaintiff's] claim w[ould] *unduly* affect the independence of the executive branch."[49] The standard that *Bistrian* applied cannot be squared with *Egbert*'s articulation of the second step. And *Bistrian*'s holding about which alternative remedies count as special factors has likewise been superseded by *Egbert*. In *Bistrian*, we concluded that "[t]he administrative grievance process [wa]s not an alternative [remedy]."[50] But *Egbert* holds that an administrative grievance procedure *is* an alternative remedy that forecloses a *Bivens* action.[51]

Finally, *Egbert* instructs that the two-step framework established in *Ziglar* largely reduces to just one question: "whether there is *any* reason to think that Congress *might* be better equipped to create a damages remedy."[52] By itself, the "uncertainty" that results from extending *Bivens* to a new context "forecloses relief."[53] And "[t]he newness of [a] 'new context' . . . alone require[s] dismissal."[54] To sum up, we read *Egbert* to require the following: unless a case is indistinguishable from *Bivens*, *Davis*, or *Carlson*, a damages

---

[47] *Egbert*, 596 U.S. at 492 (emphasis added).

[48] *Id.* (emphasis added).

[49] *Bistrian*, 912 F.3d at 92–93 (emphasis added).

[50] *Id.* at 92.

[51] *See Egbert*, 596 U.S. at 497–98.

[52] *Id.* at 492 (emphasis added).

[53] *Id.* at 493.

[54] *Id.* (cleaned up).

14

remedy may be created by Congress, but not by the courts. Because *Bistrian* and *Shorter* took a more lenient approach than *Egbert*, we now recognize their abrogation.

Respect for our own precedents "must succumb when a prior holding of our Court . . . conflicts with a subsequent Supreme Court holding."[55] And we have also recognized the abrogation of Circuit precedent by more recent Supreme Court precedent that has "undermined [our Circuit's] rationale."[56] *Egbert* seriously undermines the rationale of *Bistrian* and *Shorter*. For that reason, the Fourth Circuit rejected our decision in *Bistrian*, explaining that "the Third Circuit did not have the benefit of the Court's more recent *Bivens* guidance."[57] We agree with our sister court. Accordingly, we now align Third Circuit law with the Supreme Court's recent teachings in *Egbert*.[58]

---

[55] *Karns v. Shanahan*, 879 F.3d 504, 515 (3d Cir. 2018). Indeed, "[a] panel of our Court may decline to follow a prior decision of our Court . . . whether the conflicting Supreme Court decision was rendered before or after our prior decision." *United States v. Tann*, 577 F.3d 533, 541 (3d Cir. 2009). Here, *Bistrian* and *Shorter* conflict with the Supreme Court's subsequent decision in *Egbert.*
[56] *United States v. Stevens*, 70 F.4th 653, 659 (3d Cir. 2023).
[57] *Bulger v. Hurwitz*, 62 F.4th 127, 139 (4th Cir. 2023).
[58] In *Xi v. Huagen*, 68 F.4th 824 (3d Cir. 2023), our Court applied *Egbert* and declined to extend *Bivens*. *See id.* at 837. So we had no occasion there to consider the continued vitality of *Bistrian* and *Shorter*.

B

Applying *Egbert* to the facts of this appeal, we hold that there is no implied constitutional damages action against federal officials who fail to protect prisoners from the criminal acts of their fellow inmates. So Fisher has no *Bivens* cause of action.

1

We begin by asking whether Fisher's case differs meaningfully from *Bivens*, *Davis*, and *Carlson*.[59] It does. Fisher's case is about prison officials who allegedly violated the Eighth Amendment by failing to prevent inmate-on-inmate violence. *Bivens* was about narcotics agents who allegedly violated the Fourth Amendment by searching a home without a warrant. And *Davis* was about a Congressman who allegedly violated the Fifth Amendment by firing a staffer because of her sex. *Carlson* comes closer to this appeal: it involved a claim against prison officials who allegedly violated a prisoner's Eighth Amendment rights when they failed to provide medical treatment.

But *Carlson* is not close enough to satisfy *Egbert*. The Supreme Court has instructed that a case can differ meaningfully from *Bivens*, *Davis*, and *Carlson* even when it involves the same constitutional right as one of those cases.[60] So the fact that *Carlson* and this case both involve Eighth Amendment claims is insufficient. The relevant question is whether an Eighth Amendment claim for failure to provide medical treatment differs meaningfully from an Eighth

---

[59] *See Egbert*, 596 U.S. at 483.
[60] *See Hernandez v. Mesa*, 589 U.S. 93, 103 (2020).

16

Amendment claim for failure to prevent inmate-on-inmate assault.

The difference is clear. Unlike a failure-to-treat claim, a failure-to-protect claim seeks to impose liability on prison officials who fail to control the behavior of third parties. Preventing inmate-on-inmate assault requires keeping dangerous inmates apart from the targets of their violence. Decisions about the placement and transfer of inmates involve different concerns than decisions about the treatment of diseases like asthma. And a cause of action for failure to protect from inmate-on-inmate violence is likely to have different "systemwide consequences" than *Carlson*'s cause of action for failure to provide medical treatment.[61] So this case differs from *Carlson* in meaningful ways.

Our sister courts support our decision here. Applying *Egbert*, the Fourth, Seventh, and Ninth Circuits have held that recognizing a damages action for failure to protect would require an impermissible extension of *Bivens*.[62] The Fourth Circuit reasoned, as we now do, that "organizational policies, administrative decisions, and economic concerns inextricably tied to inmate transfer and placement determinations" make failure-to-protect claims different from failure-to-treat claims.[63] And the Ninth Circuit correctly concluded that the "mechanism of injury" differs as between a failure-to-treat

---

[61] *Egbert*, 596 U.S. at 493 (cleaned up).

[62] *See Bulger*, 62 F.4th at 137–42; *Sargeant v. Barfield*, 87 F.4th 358, 364–69 (7th Cir. 2023); *Chambers v. Herrera*, 78 F.4th 1100, 1105–07 (9th Cir. 2023).

[63] *Bulger*, 62 F.4th at 138.

17

claim and a failure-to-protect claim: the latter seeks to hold prison officials liable for harm caused by "other[s]."[64]

Our sister courts also agree that plaintiffs cannot invoke *Bivens* by analogizing their cases to *Farmer*. Such "reliance on *Farmer* is misplaced"[65] because "the Supreme Court has never recognized *Farmer* as a *Bivens* action."[66] Although it might not have seemed so before, the *Egbert* Court has now made it clear that *Bivens*, *Davis*, and *Carlson* are the only three cases in which the Supreme Court has recognized a constitutional damages action against federal officials.[67] "Since these cases"—the last of which was decided in 1980—"the Court has not implied additional causes of action under the Constitution."[68] The theory that the 1994 *Farmer* decision counts as a *Bivens* case is "contrary to" this teaching.[69] And "neither *Bivens*, *Davis*, nor *Carlson* involved an official's alleged failure to . . . protect an inmate from prisoner-on-prisoner violence."[70] So Fisher's failure-to-protect claim differs meaningfully from the Court's three *Bivens* contexts.

2

Having concluded that Fisher's case differs from the three relevant Supreme Court cases, we next ask whether any

---

[64] *Chambers*, 78 F.4th at 1106.

[65] *Bulger*, 62 F.4th at 138.

[66] *Chambers*, 78 F.4th at 1105 n.2; *see also Sargeant*, 87 F.4th at 365 (*Farmer* "never held—just assumed—that a *Bivens* remedy was available to the plaintiff.").

[67] *See Egbert*, 596 U.S. at 492.

[68] *Id.* at 491.

[69] *Bulger*, 62 F.4th at 139.

[70] *Id.*

special factor indicates that the judiciary may be less suited than Congress to weigh the costs and benefits of a damages remedy.[71] Any special factor—even one—suffices to foreclose a new *Bivens* cause of action.[72] If there is a single reason to pause, then we may not recognize a *Bivens* remedy.[73]

This appeal presents many reasons to pause before implying a *Bivens* remedy for failure to prevent inmate-on-inmate assault. To start, the "impact on governmental operations systemwide" is a reason why Congress, rather than the judiciary, may be better suited to authorize a damages remedy for failure to prevent assault.[74] Defendants argue, as they did in the District Court, that Fisher's novel *Bivens* claim would impose systemwide costs on the BOP: liability here would deprive the BOP and its employees of the wide-ranging deference they need to preserve order and maintain security. We agree. Fisher's claim "seeks to impose liability on prison officials on a systemic level," and this "new category of prison litigation" would place "a substantial burden . . . on government operations."[75]

If the systemwide impact weren't enough, another quintessential special factor is also present: "an alternative remedial structure."[76] The BOP's Administrative Remedy Program is available to Fisher. That Program "allow[s] an inmate to seek formal review of an issue relating to any aspect

---

[71] *Egbert*, 596 U.S. at 492.

[72] *Id.* at 493, 496.

[73] *Id.* at 492.

[74] *Egbert*, 596 U.S. at 491 (cleaned up).

[75] *Bulger*, 62 F.4th at 141 (cleaned up); *see also Chambers*, 78 F.4th at 1106 (same).

[76] *Egbert*, 596 U.S. at 493.

of his/her own confinement."[77] "Although the [Program] does not include a money damages remedy, inmates may file an administrative grievance with the BOP or seek an injunction in federal court to stop a pending transfer to a new facility."[78] An alternative remedy need not be "as effective as an individual damages remedy" to foreclose a *Bivens* extension.[79] "So long as Congress *or the Executive* has created a remedial process that it finds sufficient to secure an adequate level of deterrence, the courts cannot second-guess that calibration by superimposing a *Bivens* remedy."[80]

Accordingly, we join our sister courts and hold that the BOP's Administrative Remedy Program precludes a *Bivens* remedy.[81] In doing so, we track the Supreme Court's holding in *Egbert* that an agency's grievance process is a special factor foreclosing *Bivens* relief.[82] And we recognize the abrogation of *Bistrian*'s contrary holding that "[t]he administrative grievance process is not an alternative [remedy]."[83]

\* \* \*

Fisher cannot rely on our previous decisions that recognized a *Bivens* action for failure to prevent inmate-on-inmate violence. The Supreme Court's decision in *Egbert* has

---

[77] 28 C.F.R. § 542.10(a).

[78] *Bulger*, 62 F.4th at 140 (cleaned up).

[79] *Egbert*, 596 U.S. at 498 (cleaned up).

[80] *Id.* (emphasis added).

[81] *See Silva v. United States*, 45 F.4th 1134, 1141 (10th Cir. 2022) (citing *Egbert*, 596 U.S. at 498); *Bulger*, 62 F.4th at 140–41; *Chambers*, 78 F.4th at 1106–07.

[82] *See Egbert*, 596 U.S. at 497–98.

[83] *Bistrian*, 912 F.3d at 92.

abrogated those precedents. Applying *Egbert*, we hold that no constitutional claim lies against federal officials who fail to protect a prisoner from the violence of other inmates. So Fisher has no cause of action under *Bivens*.

## III

Even if Fisher had a cognizable *Bivens* claim, we agree with the District Court that such a claim would be untimely under New Jersey's two-year statute of limitations for personal injury actions.[84] Because timeliness was raised by the parties and ruled on by the District Court, we hold in the alternative that this action is time-barred.[85]

## A

Though Fisher's action arises under federal law, that "does not preclude the application of the statute of limitations of the state."[86] Where, as here, Congress has enacted no statute of limitations for a federal tort, we ordinarily borrow the statute of limitations from state law.[87]

But what happens when a state provides multiple statutes of limitations, each of which plausibly "govern[s] an

---

[84] *See* N.J. Stat. Ann. § 2A:14-2.

[85] *See United States v. Adams*, 36 F.4th 137, 147 (3d Cir. 2022) ("[A]n alternate holding has the same force as a single holding; it is binding precedent.") (cleaned up), *cert. denied*, 143 S. Ct. 238 (2022).

[86] *O'Sullivan v. Felix*, 233 U.S. 318, 322 (1914).

[87] *See Johnson v. Ry. Express Agency, Inc.*, 421 U.S. 454, 462 (1975); *Bd. of Regents of Univ. of State of N.Y. v. Tomanio*, 446 U.S. 478, 483–84 (1980).

analogous cause of action?"[88] The Supreme Court has held that claims brought under 42 U.S.C. § 1983 "are best characterized as personal injury actions," so a state's statute of limitations for injury to person applies.[89] And "where state law provides multiple statutes of limitations for personal injury actions, courts considering § 1983 claims should borrow the general or residual statute for personal injury actions."[90] Because every state has exactly one general or residual statute of limitations for personal injury actions, this rule limits confusion and promotes predictability for plaintiffs and defendants alike.[91]

The seminal case in this area is *Owens v. Okure*.[92] There the Supreme Court clarified the rule for § 1983 claims, but did not speak to the limitations period for *Bivens* claims. Yet almost all our sister courts have held that the general or residual personal injury statute of limitations applies to *Bivens* claims too.[93] And with good reason. Though a judicially created

---

[88] *Tomanio*, 446 U.S. at 483–84.

[89] *Wilson v. Garcia*, 471 U.S. 261, 280 (1985), *abrogation on other grounds recognized*, *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 377–78 (2004).

[90] *Owens v. Okure*, 488 U.S. 235, 249–50 (1989).

[91] *See id.* 245–48.

[92] 488 U.S. 235 (1989).

[93] *See Gonzalez v. Hasty*, 802 F.3d 212, 219–20 (2d Cir. 2015); *Reinbold v. Evers*, 187 F.3d 348, 359 n.10 (4th Cir. 1999); *Spotts v. United States*, 613 F.3d 559, 573–74 (5th Cir. 2010); *Zappone v. United States*, 870 F.3d 551, 559 (6th Cir. 2017); *King v. One Unknown Fed. Corr. Officer*, 201 F.3d 910, 913 (7th Cir. 2000); *Sanchez v. United States*, 49 F.3d 1329, 1330 (8th Cir. 1995); *Van Strum v. Lawn*, 940 F.2d 406, 409–10 (9th Cir. 1991); *Young v. Davis*, 554 F.3d 1254, 1256 (10th Cir.

damages action, *Bivens* functions analogously to § 1983, the statutory damages action that Congress has authorized for "deprivation of . . . rights, privileges, or immunities secured by the Constitution."[94] The difference is that *Bivens* implies a damages remedy for unconstitutional action taken under color of *federal* law, while § 1983 expressly provides a damages remedy for unconstitutional action taken under color of *state* law.[95] According to the Supreme Court, it would be "untenable to draw a distinction" between *Bivens* and § 1983 in terms of the immunities that apply.[96] The Court thus views *Bivens* as indistinguishable from § 1983 in important respects—and appears to have created *Bivens* on the model of § 1983. So we see no reason to establish different timeliness principles to govern *Bivens* actions.

We therefore join the chorus and hold that *Bivens* and § 1983 actions operate under identical timeliness rules. As with § 1983, the residual or general personal injury statute of limitations applies to *Bivens*.[97] Both causes of action are best served by this "uniform, easily applicable limitations period."[98]

---

2009); *Iriele v. Griffin*, 65 F.4th 1280, 1282 n.1 (11th Cir. 2023). *But see Barrett ex rel. Est. of Barrett v. United States*, 462 F.3d 28, 38 (1st Cir. 2006) (declining to decide the issue).

[94] 42 U.S.C. § 1983.

[95] *See Kelly v. Serna*, 87 F.3d 1235, 1238 (11th Cir. 1996).

[96] *Harlow v. Fitzgerald*, 457 U.S. 800, 809 (1982) (cleaned up); *see also McSurely v. Hutchison*, 823 F.2d 1002, 1005 (6th Cir. 1987).

[97] *See Owens*, 488 U.S. at 236.

[98] *Van Strum*, 940 F.2d at 409.

Because Fisher suffered injury in New Jersey on account of Defendants' allegedly unconstitutional conduct in New Jersey, we apply that state's general personal injury statute. That law provides: "every action at law for an injury to the person caused by the wrongful act, neglect or default of any person within this State shall be commenced within two years next after the cause of any such action shall have accrued."[99] In the § 1983 context, we apply this two-year limitation when New Jersey is the applicable state.[100] So too in this *Bivens* case.

Fisher was sexually assaulted in 2013 and filed suit in 2018. Fisher's suit is untimely absent some exception.

B

Fisher claims an exception applies. According to Fisher, New Jersey's revival statute for sexual assault claims, N.J. Stat. Ann. § 2A:14-2b ("2b"), renders timely this *Bivens* suit alleging failure to prevent sexual assault. We are unpersuaded. In determining whether a constitutional tort claim is timely, we borrow only state-law timeliness rules that apply across the board to personal injury torts. We do not borrow a state's tort-specific tolling and revival rules. And because New Jersey's "2b" revival statute is specific to tort claims for sexual assault, it cannot revive an untimely *Bivens* claim.

New Jersey's "2b" statute provides that, notwithstanding any contrary statute of limitations:

---

[99] N.J. Stat. Ann. § 2A:14-2.
[100] *See Dique v. New Jersey State Police*, 603 F.3d 181, 185 (3d Cir. 2010).

an action at law for an injury resulting from the commission of sexual assault, any other crime of a sexual nature, a prohibited sexual act . . . , or sexual abuse . . . , that occurred prior to [December 1, 2019], and which action would otherwise be barred through application of the statute of limitations, may be commenced within two years immediately following [December 1, 2019].[101]

This provision created a window—from December 2019 to December 2021—for plaintiffs to bring sexual assault claims that were otherwise time-barred. Fisher filed this suit in December 2018, and it was pending before the District Court within this window. According to Fisher, this makes the suit timely.

Fisher cites *Hardin v. Straub*,[102] where the Supreme Court clarified that "[l]imitations periods in § 1983 suits are to be determined by reference to the appropriate state statute of limitations and the coordinate tolling rules."[103] At issue was a Michigan statute that gave anyone "under 18 years of age, insane, or imprisoned at the time the claim accrues" an additional "1 year after the disability is removed" to bring a cause of action, "although the period of limitations has run."[104]

---

[101] N.J. Stat. Ann. § 2A:14-2b.
[102] 490 U.S. 536 (1989).
[103] *Id.* at 539 (cleaned up).
[104] *Id.* at 540 (quoting Mich. Comp. Laws Ann. § 600.5851(1) (1987)).

The Supreme Court held that Michigan's tolling provision rendered the plaintiff's § 1983 suit timely.[105]

Fisher likens New Jersey's "2b" statute to the Michigan statute. We see it differently. The tolling statute in *Hardin* applied to all personal injury torts: anyone suffering from a legal disability received extra time to file suit for any tort. New Jersey's "2b" statute, by contrast, is tort-specific: it applies only to torts that involve sexual assault, crimes of a sexual nature, prohibited sex acts, or sexual abuse.[106] Adopting tort-specific tolling and revival rules would conflict with the "general or residual personal injury approach" to timeliness that the Supreme Court in *Owens* instructed us to follow.[107]

As *Owens* explains, there are strong "[f]ederal interests in uniformity, certainty, and the minimization of unnecessary litigation."[108] These interests require federal courts to "borrow the general or residual statute for personal injury actions."[109] And, as *Hardin* holds, when we borrow that general personal injury statute of limitations, we likewise borrow "coordinate" or "interrelated . . . provisions regarding tolling, revival, and questions of application."[110]

We need to harmonize *Owens*'s command to borrow the general limitations period with *Hardin*'s requirement to borrow "coordinate" tolling and revival provisions. In doing so, we conclude that tolling and revival provisions are

---

[105] *See id.* at 542–44.

[106] *See* N.J. Stat. Ann. § 2A:14-2b.

[107] *Owens*, 488 U.S. at 242.

[108] *Id.* at 240.

[109] *Id.* at 250.

[110] *Hardin*, 490 U.S. at 539 (cleaned up).

"coordinate" with the general limitations period only when they apply generally to personal injury torts. In other words, a federal court deciding a constitutional tort case borrows state tolling and revival rules that apply to all personal injury torts. But it does not borrow specialized tolling and revival rules— those which apply only to a subset of personal injury torts.

At least three of our sister courts have synthesized the Supreme Court's teachings in *Owens* and *Hardin* as we do here.[111] In constitutional tort cases, they borrow state tolling and revival rules that apply across the board to personal injury torts, but do not borrow tort-specific tolling and revival rules. Accordingly, "[o]nly generally applicable tolling provisions— such as those based on minority, incapacity, and equitable grounds—should be incorporated" in § 1983 and *Bivens* cases.[112]

The point of our rule is to avoid doubt and dispute about which state-law tort is most analogous to the federal constitutional tort. It would "frustrate 'the federal interest in uniformity and the interest in having firmly defined, easily applied rules'" if we "appl[ied] the residual statute of limitations" but then "adopt[ed] a tort-specific tolling provision."[113] By borrowing only those tolling rules that apply

---

[111] *See Kane v. Mount Pleasant Cent. Sch. Dist.*, 80 F.4th 101, 108–11 (2d Cir. 2023); *Bonneau v. Centennial Sch. Dist.*, 666 F.3d 577, 580 (9th Cir. 2012); *Varnell v. Dora Consol. Sch. Dist.*, 756 F.3d 1208, 1212–13 (10th Cir. 2014).

[112] *Varnell*, 756 F.3d at 1213.

[113] *Bonneau*, 666 F.3d at 580 (quoting *Wilson*, 471 U.S. at 270).

generally to personal injury torts, we avoid making "a choice among multiple tolling provisions."[114]

Under our approach, the applicable tolling and revival rules never depend on the "precise legal theory of the claim."[115] There is "no need to analyze the nature of the underlying claims,"[116] because the same state timeliness rules apply to every federal constitutional tort claim—no matter which constitutional right is at issue and no matter which common-law right it resembles. For example, we never ask whether an alleged Fourth Amendment violation is more like trespass or false imprisonment. And we never ask whether an alleged Eighth Amendment violation is more like a sexual assault tort or a medical malpractice tort. A trespass-specific tolling rule or sexual-assault-specific revival rule can never apply, which rules out the need for such inquiries.

New Jersey's "2b" statute is a specialized revival provision that applies only to sexual assault torts. So "2b" is not "coordinate" or "interrelated" with the general personal injury statute of limitations,[117] and we cannot apply "2b" to render Fisher's constitutional tort claims timely.[118]

---

[114] *Id.* (cleaned up).

[115] *Wilson*, 471 U.S. at 274.

[116] *Kane*, 80 F.4th at 109.

[117] *Hardin*, 490 U.S. at 539.

[118] Fisher also cites a New Jersey tolling provision: "Nothing in [the seven-year statute of limitations for sexual assault claims] is intended to preclude the court from finding that the statute of limitations was tolled in an action because of the plaintiff's mental state, physical or mental disability, duress by the defendant, or any other equitable grounds." N.J. Stat. Ann.

C

Fisher's fallback position is that the complaint qualifies for equitable tolling. New Jersey's general tolling principles apply because we borrow them together with the state's general personal injury statute of limitations.[119] We have characterized New Jersey's doctrine of equitable tolling as "narrowly limited."[120] More importantly, the New Jersey Supreme Court teaches that "the doctrine of equitable tolling of limitations periods has been applied only in narrowly-defined circumstances."[121] Those "very limited circumstances" are:

> (1) if the defendant has actively misled the plaintiff,
>
> (2) if the plaintiff has in some extraordinary way been prevented from asserting his or her rights, or

---

§ 2A:14-2a(b)(2). This provision may establish a specialized tolling rule for sexual assault cases. *Cf. R.L. v. Voytac*, 971 A.2d 1074, 1083–84 (N.J. 2009) (interpreting an analogous statute as a specialized tolling provision). If so, it cannot apply to render this *Bivens* suit timely. And if it does not create a tort-specific rule for sexual assaults, then it merely restates the generally applicable state law of equitable tolling.

[119] *See Dique*, 603 F.3d at 185.

[120] *Knight v. Brown Transp. Corp.*, 806 F.2d 479, 484 (3d Cir. 1986).

[121] *R.A.C. v. P.J.S., Jr.*, 927 A.2d 97, 107 (N.J. 2007).

(3) if the plaintiff has timely asserted his or her rights mistakenly in the wrong forum.[122]

And equitable tolling "does not excuse claimants from exercising the reasonable insight and diligence required to pursue their claims."[123] New Jersey law—which allows equitable tolling in these three circumstances only if the plaintiff also exercises diligence—is essentially the same as our test for equitable tolling.[124] And our precedent on the federal law of tolling can be relevant because "[w]here state tolling principles contradict federal law or policy, federal tolling principles may apply."[125]

There is no suggestion that Fisher timely filed in the wrong forum, so Fisher is entitled to equitable tolling only if a Defendant actively misled Fisher or if Fisher was prevented in some extraordinary way from filing. Fisher makes two arguments on this score, which we address in turn.

1

Fisher first claims that Captain Fitzgerald tricked Fisher into allowing the two-year filing deadline to pass. According to Fisher's declaration:

Captain Fitzgerald said I should never talk about the rapes for my own safety, because [the rapist]

---

[122] *Barron v. Gersten*, 277 A.3d 502, 504 (N.J. App. Div. 2022) (cleaned up), *cert. denied*, 286 A.3d 187 (N.J. 2022).

[123] *Id.* at 505.

[124] *See D.J.S.-W. by Stewart v. United States*, 962 F.3d 745, 750 (3d Cir. 2020).

[125] *Kach v. Hose*, 589 F.3d 626, 639 (3d Cir. 2009).

30

could still find me even . . . after I transferred to the other prison, and the prison staff would not protect me from violence if I "snitched." . . . Captain Fitzgerald told me I must wait until the BOP conducted an internal investigation and until BOP attorneys contacted me, and she strongly urged me not to contact any attorney regarding the rapes.[126]

As the District Court noted, Fisher "was transferred out of state and far beyond the reach of Captain Fitzgerald"—and, we may add, beyond the reach of Fisher's assailant—"a mere two months after the assaults."[127] So Fisher "had the vast majority of the two-year limitation period within which to file a complaint where the captain had no ability to deter or interfere."[128]

The District Court's conclusion—that Fisher was not entitled to equitable tolling—aligns with our precedent. In *Kach v. Hose*,[129] we applied the federal law of equitable tolling, assuming *arguendo* it might be more plaintiff-friendly than state law.[130] There, a high school student ran away with a public-school employee and lived with him from age 14 to age 24.[131] After escaping, she sued school officials, including her captor, under § 1983.[132] She argued that equity tolled the

---

[126] App. 77.
[127] *Fisher*, 2022 WL 3500432, at *5.
[128] *Id.*
[129] 589 F.3d 626 (3d Cir. 2009).
[130] *See id.* at 645.
[131] *See id.* at 630–31.
[132] *See id.*

limitations period until she was freed at age 24.[133] We disagreed, holding that equitable tolling did not render timely the claims of a young woman who was still under the control of a man who had abducted her as a minor.[134] It follows that Fisher, who was soon transferred far from Fitzgerald's control, cannot qualify for equitable tolling here.

Moreover, as Defendants argue and as the District Court found, Fisher has not shown the diligence required for equitable tolling.[135] Once transferred away from Fitzgerald, Fisher could have asked staff at the new prison whether it was necessary to await the results of an internal investigation before filing suit. Instead, Fisher "believed Captain Fitzgerald completely."[136] That lack of diligence rules out equitable tolling.

2

Fisher next cites mental health—and unique vulnerability—as justifications for equitable tolling here. Recall that the two-year limitations period began running in summer 2013 and expired in summer 2015. Well within that period, in January 2014, "Fisher stated he is currently feeling 'good.'"[137] And in a December 2014 report, Fisher was characterized as "alert and oriented on all domains" with "no

---

[133] *See id.* at 635.

[134] *See id.* at 645.

[135] *See Fisher*, 2022 WL 3500432, at *5.

[136] App. 77.

[137] Supp. App. 58.

behavioral abnormalities."[138] Fisher's "[t]hought-processes were organized, coherent, and goal-directed."[139]

If anything, these psychological records show that Fisher's mental health was worse by December 2018, when suit was filed. In October 2018, for instance, Fisher wrote: "[M]y PTSD symptoms . . . [are] getting worse. I try to cope, calm myself, etc…, but nothing helps. The flashbacks, debilitating stress, etc., I relive the rapes daily. I'm no better now than years ago."[140] Despite all that, Fisher managed to file suit. So Fisher's delay in filing suit was not attributable to issues of mental health or unique vulnerability.

We conclude by noting that "[c]ourts that have allowed equitable tolling based on mental illness have done so only in exceptional circumstances, such as where the complainant is institutionalized or adjudged mentally incompetent."[141] And New Jersey law, which requires "mental disability" for the tolling of general personal injury torts,[142] comports with federal caselaw on this point.[143] After reviewing Fisher's allegations and the records attached to the complaint, we agree with the District Court that this case does not warrant equitable

---

[138] Supp. App. 59.

[139] *Id.*

[140] Supp. App. 63.

[141] *Lyons v. Potter*, 521 F.3d 981, 983 (8th Cir. 2008), *quoted in Kach*, 589 F.3d at 64.

[142] N.J. Stat. Ann. § 2A:14-21.

[143] *See Kelsey v. Cohen*, 2012 WL 1672889, at *2 (N.J. App. Div. May 15, 2012).

tolling.[144] We hold that Fisher's putative *Bivens* action is time-barred.

*    *    *

There is no *Bivens* cause of action for failure to prevent inmate-on-inmate assault. And even if Fisher had a cause of action, any *Bivens* claim would be time-barred by New Jersey's two-year statute of limitations for personal injury claims. New Jersey's revival provision for sexual assault claims does not apply to a *Bivens* suit, and Fisher is not entitled to equitable tolling. For these reasons, we will affirm the District Court's order.

---

[144] *See Fisher*, 2022 WL 3500432, at *6.

**RENDELL**, *Circuit Judge,* concurring in part and dissenting in part:

Though the majority dismisses Appellant's claims because they are not cognizable under *Bivens*, it then goes on to determine that because the revival provision is tort-specific, it cannot apply under our precedent. To the extent any discussion of the application of the New Jersey statute is relevant and not dicta,[1] I respectfully dissent from my colleagues and would find that the application of New Jersey's revival provision not only comports with, but is compelled by, precedent.

---

[1] "[I]f it is not necessary to decide more, it is necessary not to decide more[.]" *Anariba v. Dir., Hudson Cnty. Corr. Ctr.*, 17 F.4th 434, 449 (Nov. 3, 2021) (cleaned up). The majority views the statute of limitations discussion as an alternative holding. *Supra* at Section III.A, n. 85. But having concluded that there is no cause of action, can the statute of limitations discussion be anything but dicta? Moreover, what basis do we have to discuss the statute of limitations for a cause of action we agree is nonexistent? The Supreme Court has cautioned that we should "confine the opinion only to the very questions necessary to decision of the case." *Dames & Moore v. Regan*, 453 U.S. 654, 661 (1981); *Trump v. United States*, 603 U.S. \_\_\_\_ (2024), 144 S. Ct. 2312, 2369 (2024) (Sotomayor, J., dissenting); *see also Morse v. Frederick*, 551 U.S. 393, 431 (2007) (Breyer, J., concurring in part and dissenting in part) (chastising the majority for going further than necessary, when deciding the case solely on the qualified immunity issue before the Court would have produced a unanimous decision).

1

# I

The applicable precedent that both sides wrestle with is the Supreme Court's opinion in *Wilson*, and its follow-up opinion in *Owens*, that clarified the relevant statute of limitations for Section 1983 actions. Read together, these opinions dictate that one specific state statute of limitations— the general or residual personal injury statute—should apply. *Wilson v. Garcia*, 471 U.S. 261 (1985); *Owens v. Okure*, 488 U.S. 235 (1989). The backdrop of these opinions is key to understanding my dissenting view.

For years, federal courts had been presented with preliminary issues regarding the applicable statute of limitations in Section 1983 cases.[2] An ALR annotation recounted that this was previously a "difficult issue for the courts," replete with "uncertainty, confusion, and lack of uniformity in selecting the applicable statute of limitations in § 1983 suits." Annot., 45 A.L.R. Fed. 548, 554 (1979). Cases were stymied at the outset with the need for the court to decide this pivotal issue. *See Wilson*, 471 U.S. at 272-75 & n. 25. Litigants were uncertain as to the deadline for filing their claims. *See id.* at 273-74 ("If the choice of the statute of limitations were to depend upon the particular facts or the precise legal theory of each claim, counsel could almost always argue, with considerable force, that two or more periods of limitations should apply to each § 1983 claim."). For example, one court would apply the statute of limitations for actions based upon liability created by federal statute, while another would permit a plaintiff to proceed based upon a more

---

[2] I agree with the majority that "*Bivens* and § 1983 actions operate under identical timeliness rules." *Supra* at III.A.

generous catch-all statute of limitations. *See Lai v. City & Cnty. of Honolulu*, 749 F.2d 588, 589-90 (9th Cir. 1984). As the Court in *Wilson* noted, there was a crying need for "uniformity, certainty, and a minimization of unnecessary litigation." 471 U.S. at 275. Litigation, that is, regarding which statute of limitations should apply. Thus, the Supreme Court came up with a practical solution: it adopted a rule. Section 1983 claims are best characterized as personal injury actions, and hence a state's statute of limitations for personal injury actions should apply.[3] Reading the opinion, one gets the sense that the Court felt compelled to resolve the untenable situation in these cases.

In *Owens*, the Supreme Court next considered what state statute of limitations should apply when a state has multiple personal injury statutes. *Owens*, 488 U.S. at 236. The Court continued the "practical inquiry" it had adapted in *Wilson* and directed courts to apply the "statute that can be applied with ease and predictability in all 50 states," *id.* at 242, namely, "the general or residual statute for personal injury actions," *id.* at 249-50. The Court explained that to apply a tort-specific statute of limitations depending on the nature of the claim would just further "the present confusion" and would be inconsistent with Section 1983's broad scope. *Id.* at 244, 248.

---

[3] Notably, Justice O'Connor dissented. She accused the Court of legislating, due to Congress's failure at the time to pass any number of proposed bills to standardize the limitations period for Section 1983 claims. *Wilson*, 471 U.S. at 284 (O'Connor, J., dissenting). She cautioned that the majority's decision both co-opted federal legislation and "effectively foreclose[d] legislative creativity on the part of the States." *Id.*

3

Shortly after the Supreme Court decided *Owens*, it issued its opinion in *Hardin*, which bears specifically on the issue before us: whether state revival and tolling provisions should apply to Section 1983 and *Bivens* claims. *Hardin v. Straub*, 490 U.S. 536 (1989). I believe *Hardin* is not only relevant but controlling here. In *Hardin*, the Sixth Circuit was presented with the question of whether the court should apply a Michigan tolling provision that suspends limitations periods for prisoners and others with legal disabilities until one year after the disability has been removed. *Id.* at 537. The Sixth Circuit refused to apply the tolling provision, reasoning that applying the tolling period was "counterproductive to sound federal policy in attempting to deal with § 1983 claims as promptly as practicable." *Id.* at 542 (quoting *Higley v. Michigan Dep't of Corrections*, 835 F.2d 623, 626-27 (1987)).

The Supreme Court reversed the Sixth Circuit and made the critical statement that should be our guide: "Courts thus should not unravel state limitations rules unless their full application would defeat the goals of the federal statute at issue." *Id.* at 539. The Court determined that the state's decision to toll the statute of limitations did not frustrate the goals of Section 1983. *Id.* at 543. Instead, the Court explained that the "tolling statute reflects a legislative decision to lessen any such difficulties by extending the time in which prisoners may seek recovery for constitutional injuries. Such a statute is consistent with § 1983's remedial purpose." *Id.* at 544. In a footnote, the Court specifically rejected the notion that *Wilson*'s concerns for uniformity, certainty, and the minimization of unnecessary litigation applied here to "weigh against application of Michigan's tolling provision." *Id.* at 544, n. 14.

4

It is undisputed that *Wilson* and *Owens* dictate that, for the sake of uniformity and consistency, and to avoid unnecessary litigation, courts in Section 1983 actions should apply the forum state's general or residual personal injury statute of limitations for *Bivens* actions. But these cases go no further than that, either explicitly or implicitly. And *Hardin* reinforced that we should respect state legislative determinations unless they undermine federal policy.

## II

The Federal Defendants urge—and the majority agrees—that *Wilson* and *Owens* should operate to foreclose the application of the revival statute here. The majority states: "In determining whether a constitutional tort claim is timely, we borrow only state-law timeliness rules that apply across the board to personal injury torts. We do not borrow a state's tort-specific tolling and revival rules." *Supra* at Section III.B. But we must wonder why not. *Wilson* and *Owens* do not say this and *Hardin* says the opposite. Neither party contends that there is any confusion regarding its application or any need for uniformity. Nor is there any unnecessary litigation that would accompany the application of this revival statute or others like it. There is simply no predicament here that is analogous to that which caused the Supreme Court to take the unusual course that it did in *Wilson* and *Owens*. And no one has urged a countervailing federal policy that should cause us to disregard the state prerogative. Moreover, here we are not asked to choose one of several statutes that states have enacted that could arguably apply. Instead, we are asked to nullify New Jersey's legislative decision that plaintiffs who have experienced this type of very specific harm should be entitled

5

to more time to bring their claims. We should apply the revival provision, as the Court did in *Hardin*. 490 U.S. at 544.

The Federal Defendants' argument that because the revival provision at issue here is not "closely related" to the statute of limitations it should be nullified lacks foundation. This interpretation misreads *Wilson*. It seizes on a sentence in *Wilson* that merely states the obvious: "Only the length of the limitations period, and closely related questions of tolling and application, are to be governed by state law." 471 U.S. 261, 269 (1985). This observation is followed by a footnote that makes the unremarkable point that "[i]n virtually all statutes of limitation the chronological length of the limitation period is interrelated with provisions regarding tolling, revival, and questions of application." *Id.* at 269, n.17 (citing *Johnson v. Ry. Express Agency, Inc.*, 421 U.S. 454, 464 (1975)). *Wilson* does not instruct that only the "closely related" questions of tolling and revival can apply to federal claims (and, even if it did, such instructions would be dicta, as in *Wilson* the Court was only asked to determine which statute of limitations applied). All *Wilson* does is note that statutes of limitations and closely related questions of tolling, revival, and application are governed by state law—a proposition with which I wholeheartedly agree. That is a far cry from saying that we should refuse to apply a revival provision provided by state law when we have chosen a certain state statute of limitations for Section 1983 claims. And it is important to note that *Wilson* and *Owens* did not choose a federal statute of limitations—rather they recognized that these provisions are state centric.

Indeed, the Supreme Court in *Hardin* clarified how we should approach this issue:

6

> This tradition of borrowing analogous limitations statutes is based on a congressional decision to defer to the State's judgment on the proper balance between the policies of repose and the substantive policies of enforcement embodied in the state cause of action. In virtually all statutes of limitations the chronological length of the limitation period is interrelated with provisions regarding tolling, revival, and questions of application. Courts thus should not unravel state limitations rules unless their full application would defeat the goals of the federal statute at issue.

490 U.S. at 538-39 (cleaned up). The majority's decision to pick one of the State's statutes of limitations but then refuse to apply its tolling and revival provisions ignores the "State's judgment on the proper balance" between repose and enforcement. *Id.* at 538. It is one thing to cabin or restrict this judgment when uniformity and consistency require. It is quite another to do so for no apparent reason, as is the case here. Following *Hardin*, we should not unravel rules of revival where no federal policy requires it. *Hardin*, 490 U.S. at 539.

Like the provision in *Hardin*, the revival provision New Jersey enacted reflects the legislature's wisdom and decision to provide victims of sexual assault extra time to bring previously barred claims does not frustrate *Bivens* goals of compensation and deterrence. *See Chardon v. Fumero Soto*, 462 U.S. 650, 657 (1983) ("[N]o federal policy—deterrence, compensation, uniformity, or federalism—[is] offended by the application of state tolling rules."). "Rather, it enhances the [victim's] ability to bring suit and recover damages for

7

injuries." *Hardin*, 490 U.S. at 543. Indeed, "[t]he State also may have decided that if the official knows an act is unconstitutional, the risk that he or she might be haled into court indefinitely is more likely to check misbehavior than the knowledge that he or she might escape a challenge to that conduct within a brief period of time." *Id.* On this basis, I would apply New Jersey's sexual assault revival provision to federal *Bivens* claims.

I acknowledge that the Second, Ninth, and Tenth Circuits have reached the same conclusion as the majority does here. While I believe their rhetoric is appealing, I find their reasoning less so. In *Kane v. Mount Pleasant School District*, the Second Circuit, presented with a situation similar to the one before us today, declined to apply New York's child sex abuse revival provision. In doing so, it stated that "[i]t would strain credulity that the Supreme Court would require federal courts to abstain from a factual analysis for purposes of determining the appropriate statute of limitations, only to allow courts to engage in that same analysis to determine if a revival or tolling provision applies." 80 F.4th 101, 109 (2d Cir. 2023). The majority similarly alludes to some theoretical "doubt and dispute" that the application of New Jersey's revival provision would entail. *Supra* at Section III.B. But two questions come to mind in response: where did *Wilson* concern itself with fact finding, as such, and what fact finding is actually required? The unnecessary litigation that *Wilson* was concerned with had less to do with a hesitation to engage in a factual inquiry and more to do with selecting the most appropriate statute under several potential theories of liability based on known facts. Here, we are presented with a straightforward revival provision; either it applies or it does not. What litigation, let alone fact finding, will occur in order for the court to determine whether the

8

plaintiff's claim is timely? I suggest, none. Furthermore, there is no "choice" to be made here, as in the case of the statute of limitations. Rather, we are essentially nullifying something the New Jersey legislature has enacted. To do so runs counter to Supreme Court precedent in *Hardin*. And, to give force to these tolling provisions furthers, rather than undermines, the broad remedial purpose of Section 1983 and of *Bivens*.

Moreover, if we believe that *Wilson* dictates nullifying state law that would entail fact finding regarding the time provided to bring suit, what does it do to equitable tolling analyses, which are, by their very nature, intensely fact bound? Why is application of a revival provision any more difficult to apply than principles of equitable tolling—which neither side contends should be done away with? In fact, it isn't. In essence, there is no basis for nullifying a state's revival statute any more than we would do away with principles of equitable tolling. *Wilson* and *Owens* don't hint at it, let alone require it. Moreover, *Hardin* could be said to point in the opposite direction.

In *Bonneau*, the Ninth Circuit refused to interpret the extended 20-year statute of limitations for child abuse victims as a tolling provision, and thus declined to apply it to a Section 1983 claim. The majority quotes the analysis from *Bonneau*, in which the Ninth Circuit posited that it would "no less frustrate 'the federal interest in uniformity and the interest in having firmly defined, earlier applied rules' were we to obediently apply the residual statute of limitations, only to adopt a tort-specific tolling provision." *Supra* at Section III.B (quoting *Bonneau v. Centennial Sch. Dist. No. 28J*, 666 F.3d 577, 580 (9th Cir. 2012). *Bonneau* then pretends to quote from *Owens*, but actually inserts the word "tolling" where it does not appear

9

in *Owens* when it says, "Such a holding 'would succeed only in transferring the [ ] confusion over the choice among multiple [statutes of limitations] to a choice among multiple [tolling] provisions.'" *Id.* (citing *Owens*, 488 U.S. at 244) (alterations in original). The unaltered language from *Owens* reads that, "we would succeed only in transferring the present confusion over the choice among multiply personal injury provisions to a choice among multiple intentional tort provisions." *Owens*, 488 U.S. at 244. But more to the point, I question the very premise of this reasoning from *Bonneau*, which the majority adopts, *supra* at Section III.B, which is that there *are* multiple, tort-specific tolling provisions just as there are multiple, tort-specific statutes of limitations.

And, I am unconvinced that we should view the revival or tolling provisions at issue here as *tort*-specific. To the contrary, they are *victim*-specific. It doesn't matter whether the underlying act was technically an assault, a battery, rape, or murder. It is the *victim* of a broad category of offenses that is entitled to take advantage of the revival provision. Why is the sexual abuse victim any different from the legally disabled prisoner in *Hardin*? New Jersey and Michigan have identified that certain victims deserve special treatment—with no showing that there is confusion about who can avail themselves of the provision or any need for uniformity—and as long as there is no undermining of a federal policy or interest (as there is with non-uniform statutes of limitation in Section 1983 cases in general), why should they not be permitted to do so?

We have heard from various amici urging policy reasons as to why we should reverse this order. While I do not reason based on policy, I truly regret that victims of sexual abuse are being denied their day in court, and that New Jersey's

policy that they be permitted to do so is being thwarted, based upon a flawed premise and logic that does not withstand scrutiny. The nullification of these important tolling and revival provisions is something that the Supreme Court should examine and tell the circuits whether *Hardin* is indeed distinguishable, as the majority posits, or whether it has the force that I am reading into it.

## III

For the reasons set forth above, I respectfully dissent from my colleagues as to the applicability of New Jersey's revival provision.

11